**UNITED STATES of America**

v.

**Kenneth A. TATUM.**

**No. CRIM. 1:99CR164(2)TH.**

United States District Court,
E.D. Texas,
Beaumont Division.

Aug. 10, 2000.

George Patrick Black, FPD, Federal Public Defender, Tyler, TX, Smith, Douglas Milton Barlow, Beaumont, TX, for Kenneth A. Tatum.

Robert James Middleton, AUSA, U.S. Attorney's Office, Tyler, TX, for U.S.

### MEMORANDUM OPINION REGARDING MOTION FOR SUPPRESSION OF PHYSICAL EVIDENCE

HEARTFIELD, District Judge.

Before the Court is *Defendant's Motion for Suppression of Physical Evidence* [Clerk's Docket No. 362] filed June 22, 2000. The Court held an evidentiary hearing on the motion July 25, 2000. On July 31, 2000, the Court entered an order [Clerk's Docket No. 479] denying the motion for the reasons which follow.

### I. PROCEDURAL BACKGROUND

Kenneth A. Tatum is before this Court for alleged violations of 18 U.S.C. § 2113 (entering bank with intent to commit felony—attempted armed bank robbery resulting in death), 18 U.S.C. § 924 (use of a

firearm in the course of a crime of violence or murder), 18 U.S.C. § 1951(a) (interference with commerce by robbery or attempted robbery) and 18 U.S.C. § 2 (aiding and abetting).

The defendant was arraigned on June 2, 1999, at which time he pled not guilty to counts one and two of the indictment. On October 22, 1999, the defendant was advised that the government intended to seek the death penalty. The case was set for jury selection on July 31, 2000 [Clerk's Docket No. 190].

On June 22, 2000, defendant filed several pre-trial motions, including a *Motion for Suppression of Physical Evidence* [Clerk's Docket No. 362]. The government filed its response [Clerk's Docket No. 435] in opposition to the motion on July 5, 2000. The Court held an evidentiary hearing on the motion with the defendant present on July 25, 2000. On July 31, 2000, the Court entered an order denying the motion for the reasons which follow.

## II. FACTUAL BACKGROUND

Defendant seeks the exclusion of evidence he contends was obtained in violation of his constitutional rights.

The defense takes issue with four searches of the defendant's home, automobile, jail property and person that occurred between January 15, 1999 and February 3, 1999. *See Def.'s Mot. at II.* He contends the searches violated the Fourth Amendment to the United States Constitution, which provides:

The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

Defendant advances two arguments in support of his position that the searches violated his Fourth Amendment rights: (1) failure of consent and (2) warrant not supported by probable cause. The Court will consider those arguments in turn.

## III. ANALYSIS

### A. FAILURE OF CONSENT

In the course of the investigation of the crimes alleged in the indictment, law enforcement officials twice searched the residence defendant shared with his grandparents, mother and siblings. The government submits that the searches comport with the requirement of the Fourth Amendment because Ms. Tatum, the defendant's mother, consented to the searches of the residence on both occasions. The defendant contends the searches were constitutionally infirm and that the evidentiary fruits of the search should be inadmissible because: (1) his mother's consent to search was not voluntary; (2) his mother did not have the authority to consent to the search of his bedroom; and (3) the scope of the search exceeded any consent that may have been given. *See Def.'s Mot. at II(A)(D).*

#### 1. *Legal Background*

■ Warrantless searches are *per se* unreasonable, and therefore unconstitutional, unless they fall into one of the specifically established exceptions[1] to the general rule requiring a warrant supported by probable cause prior to undertaking a search. *See Schneckloth v. Bustamonte,* 412 U.S. 218, 219, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973). One such exception is that a warrantless search is permissible where valid consent to search has been obtained. *Id.* The consent exception

---

1. The six recognized exceptions to the warrant requirement are: (1) search incident to lawful arrest; (2) search of an automobile supported by probable cause; (3) plain view exception; (4) consent; (5) "stop and frisk" supported by reasonable suspicion; and (6) hot pursuit/evanescent evidence.

is conceptually considered a waiver of the rights protected by the Fourth Amendment. *See Schneckloth*, 412 U.S. at 235, 93 S.Ct. 2041; *see also United States v. Webster*, 162 F.3d 308, 333 (5th Cir.1998).

In order for evidence obtained as a result of a consensual search to be admissible at trial, the government must prove, by a preponderance of evidence, one, that consent to search was voluntarily given, and two, that such consent was effective— that is secured from the defendant or a third party with the authority to provide valid consent. *See Schneckloth*, 412 U.S. at 222, 93 S.Ct. 2041; *see also United States v. Matlock*, 415 U.S. 164, 171, 94 S.Ct. 988, 39 L.Ed.2d 242(1974).

"[T]he question whether a consent to a search was in fact 'voluntary' or was the product of duress or coercion, express or implied, is a question of fact to be determined from the totality of all of the circumstances." *See Schneckloth*, 412 U.S. at 227, 93 S.Ct. 2041. Relevant factors to consider include:

(1) the custodial status of the individual consenting to the search;

(2) the utilization of coercive police procedures;

(3) the extent and level of the individual's cooperation with the police;

(4) the individual's awareness of her right to refuse to consent;

(5) the individual's education and intelligence; and

(6) the individual's belief that no incriminating evidence will be found.

*See United States v. Tompkins*, 130 F.3d 117, 121 (5th Cir.1997). "Although all six factors are relevant, 'no single factor is dispositive or controlling.'" *Id.*

In addition to being voluntary, consent must also be "effective." Effective consent is not limited to consent given by the defendant. *See Matlock*, 415 U.S. at 171, 94 S.Ct. 988. To the contrary, third parties who possesses common authority over the premises can in effect waive the rights protected by the Fourth Amendment with respect to all of the individuals residing at the premises. *Id.*

The authority that justifies third party consent is bottomed upon "mutual use of the property by persons generally having joint access or control for most purposes, so that it is reasonable to recognize that any of the cohabitants has the right to permit the inspection of his own right and that the others have assumed the risk that one of their number might permit the common area to be searched." *See United States v. Jenkins*, 46 F.3d 447, 455 (5th Cir.1995) (quoting *Matlock*, 415 U.S. at 171 n. 7, 94 S.Ct. 988). "The authority which justifies the third party consent does *not* rest upon the law of property, with its attendant historical and legal refinements." *Id.* (emphasis added).

Where there is not effective consent, the search may nevertheless be valid because of a reliance by law enforcement upon what reasonably appeared to be effective consent. *See Illinois v. Rodriguez*, 497 U.S. 177, 188, 110 S.Ct. 2793, 111 L.Ed.2d 148 (1990). The question is whether "'the facts available to the officer at the moment ... warrant a [person] of reasonable caution in the belief' that the consenting party had authority over the premises." *Id.*

Similarly, if a search exceeds the scope of the consent given, an officer's objectively reasonable belief that the search was within the scope of the consent is sufficient to validate the search. *See Florida v. Jimeno*, 500 U.S. 248, 249, 111 S.Ct. 1801, 114 L.Ed.2d 297 (1991).

2. *First Search of Defendant's Residence—January 15, 1999*

a. *Evidence*

At approximately 5:00 p.m. on January 15, 1999, F.B.I. Special Agent Garrett Floyd and Texas Ranger Randy Prince went to 1907 Grafton in Marshall, Texas to inquire whether Ms. Bobbie Tatum, the

defendant's mother, would consent to a search of the residence she shared with her parents, the defendant and two of her other sons. Tr. 8–10. Floyd and Prince were dressed in civilian attire and their weapons were concealed. Tr. 12.

Bobbie Tatum answered the door and invited Floyd and Prince into the residence. Tr. 11–12, 13–14, 52. Floyd and Prince identified themselves and their law enforcement connections and advised her that Kenneth Tatum was under investigation for murder and robbery. Tr. 12. Also present for this discussion were the defendant's grandparents, two of his brothers, an infant, and at some point later, the infant's mother.[2] Tr. 14, 49, 63–65, 83.

Floyd and Prince requested permission to search the residence, including the defendant's bedroom. Tr. 12, 14, 18. To determine if Ms. Tatum had the requisite authority to consent to a search, Floyd made several inquiries regarding the administration of the household. Tr. 15. Ms. Tatum advised Floyd that she paid the utilities[3] and was the legal owner of the property.[4] Tr. 15, 49. She indicated that she had the authority to consent to a search of the residence. Tr. 15. She did, however, refuse to consent to a search of the defendant's 1985 Cadillac Fleetwood Brougham vehicle for the stated reason that she did not have the authority to do so, as it was his vehicle. Tr. 27–28, 53, 74, 82.

After orally consenting to a search of the residence, Ms. Tatum executed an F.B.I. consent to search form. Tr. 15–16, 63. Both Floyd and Ms. Tatum read portions of the consent form aloud. Tr. 17, 18, 26, 53. By her signature, she acknowledged that she had been advised of her right to refuse to consent to a search of the premises. *See Gov't Ex. A.* She authorized Floyd and Prince to search the premises and to seize anything they desired. *See Gov't Ex. A.* The consent form provided that her consent was given voluntarily and was the result of neither threats nor promises of any kind. *See Gov't Ex. A.*

Floyd concluded that Ms. Tatum was educated and intelligent based upon her ability to read and write.[5] Tr. 26, 53. He also reached this conclusion based upon her work experience and her ability to maintain two (2) jobs. Tr. 26 She appeared to understand both what he had told her and what he had read to her. Tr. 26, 53. She repeated several times that her son had done nothing wrong. Tr. 12–13, 25.

The search was conducted by three search agents and was limited (at law enforcement's discretion) to Mr. Tatum's bedroom. Tr. 19, 21, 48. Ms. Tatum identified the room in which the defendant slept. Tr. 19. When the agents commenced the search, the door to the bedroom was unlocked and ajar. Tr. 19, 20. The bedroom was shared by the defendant and two of his three brothers. Tr. 20, 75, 78. Ms. Tatum acknowledged that she had general access to the room. Tr. 78–79. The search lasted approximately 1.5 hours. Tr. 22.

Ms. Tatum was cooperative, helpful, pleasant and cordial with the agents. Tr.

---

**2.** The defendant was not present. At the time of the search, he was incarcerated in the Smith County Jail, Tyler, Texas for possession of marijuana and parole revocation. Tr. 45.

**3.** Ms. Tatum testified that the household arrangement is as follows: she pays the gas bill, her father pays the electrical bill, and her mother pays the cable and water bills. Tr. 73.

**4.** Contrary to this alleged representation, Ms. Tatum testified that she assumes the legal owner of the home is in fact Walter Gholson (her deceased great grandfather) and Imogene Fields (her mother) given that the property tax assessments are in their names. Tr. 68, 73, 92.

**5.** Ms. Tatum testified that she can in fact read and write. Tr. 74. She further testified that she completed high school in Marshall, Texas. Tr. 71.

20–21, 25–26, 83. Ms. Tatum testified that she was treated fairly by the officers under the circumstances. Tr. 82. She was never in any type of custodial status. Tr. 26. Ms. Tatum provided them with a garbage bag in which to put the seized evidence. Tr. 22. Patrick Tatum, the defendant's brother, assisted in the identification of the shoes belonging to Kenneth and those belonging to the other boys. Tr. 22.

Ms. Tatum neither revoked nor limited her consent in any way. Tr. 23. Moreover, no other persons present took issue with the search generally or disputed that Ms. Tatum had the authority to consent. Tr. 23–24, 64. The defendant's grandfather requested assurances that the officers would not ransack the residence; Floyd assured him they would not. Tr. 18.

### b. *Findings*

The government has carried its burden of proving by a preponderance of evidence, one, that Ms. Tatum's consent was voluntarily given, and two, that her consent was effective inasmuch as she had common authority over the entire residence.

■ First, the government has proven by a preponderance of the evidence that Ms. Tatum's consent was freely and voluntarily given in light of the factors relevant to the question of voluntariness. The record establishes that Ms. Tatum was not in custodial status or under threat thereof at the time she consented to the search of her residence. Likewise, there is no evidence of coercive police procedures. Ms. Tatum was approached at home by two law enforcement officials who were plain clothed with their weapons concealed. The officers arrived at her home at 5:00 p.m.—a reasonable hour—and left the premises no later than 6:30 p.m. By her own testimony, Ms. Tatum acknowledged that she was treated fairly by the officers in light of the circumstances. There is no evidence of any actual or threatened legal impact had she refused to cooperate with their efforts. The extent and level of Ms. Tatum's cooperation with law enforcement further evidences that her consent was voluntary. She invited them into her residence, answered their questions, identified the room in which the defendant slept and provided them with a garbage bag in which to remove the seized evidence. Moreover, the evidence is undisputed that Ms. Tatum was advised—both orally and by way of the consent to search form—of her right to refuse to consent to the search. Ms. Tatum has sufficient education and intelligence to render her consent voluntary. She graduated from high school, maintains gainful employment and is able to read, write and express herself. That she refused to consent to the search of her son's automobile demonstrates that she understood as an intellectual matter that she could refuse to consent to the search and that her consent was based upon her authority over the premises. Finally, that Ms. Tatum believed that no incriminating evidence would be found supports the position that her consent was voluntary.

■ Second, the government has carried its burden of proving that Ms. Tatum's consent was effective. She and the defendant (amongst others) shared mutual use of the residence. They all had joint access and control of the premises. It is therefore reasonable to recognize that Ms. Tatum had the right to permit the inspection and that the defendant assumed the risk that she might permit the residence to be searched. That she may or may not have been the "legal owner" of the residence is of no moment and in no way affects whether or not she had common authority over the premises.

■ Moreover, even if Ms. Tatum's consent to search was not effective, the law enforcement officials were justified in relying upon her representations to the effect that she had common authority over the residence. Ms. Tatum represented to the officers that she paid the utilities, was the lawful owner of the premises and that she had the authority to consent to the search

of the residence. Their reliance on these representations was reasonable—that is, the facts available to Floyd and Prince warranted persons of reasonable caution in the belief that Ms. Tatum had common authority over the residence.

 Finally, law enforcement did not exceed the scope of the consent given. To the contrary, the search agents limited the search to the defendant's bedroom in spite of the fact that Ms. Tatum had consented both orally and in writing, to a search of the entire residence.

It is for these reasons that the Court denied the defendant's motion to suppress the evidence seized as a result of the first search of the defendant's residence.

### 3. Second Search of Defendant's Residence—January 21, 1999

#### a. Evidence

At approximately 6:00 p.m. on January 21, 1999, F.B.I. Special Agents Garrett Floyd and Jeff Block made contact with Ms. Tatum at her place of employment. Tr. 28–29. Floyd and Block were dressed in civilian clothes and their weapons were concealed. Tr. 30–31.

They advised Ms. Tatum that they had reason to believe that there was evidence relevant to the murders in her backyard. Tr. 31, 84. At that time, a burn pile was located in the back yard of 1907 Grafton, approximately ten (10) feet from the residence. Tr. 36. The family used the burn pile to eliminate waste that the collection services would not remove. Tr. 84, 90.

Ms. Tatum again expressed her belief that her son had done nothing wrong. Tr. 33. She orally consented to the search because she believed it would help exonerate him. Tr. 31, 33, 41, 85. Floyd then read the F.B.I. consent to search form to her. Tr. 32. He asked her to read portions of the consent form aloud, and she complied. Tr. 32. She then executed the

consent form, which made clear that: the F.B.I. requested consent to search 1907 Grafton and the area around that residence; she had been advised of her right to refuse consent; she consented to the search voluntarily; and she authorized them to take any items from the premises they deemed relevant to the investigation. Tr. 31–32, 69, 85; *Gov't Ex. C.*

Floyd described Ms. Tatum as cooperative. Tr. 41. Ms. Tatum described their behavior toward her as cordial and non-threatening. Tr. 85. She did, however, testify that Floyd advised her he would obtain a search warrant if she refused to consent to the search. Tr. 69–70, 71, 85. She testified that she would not have consented to the search had he not made that representation to her.[6] Tr. 71.

Ms. Tatum was not arrested or placed in any type of custodial status. Tr. 41.

The agents then went to 1907 Grafton. Mr. Fields, the defendant's grandfather, answered the front door and invited them inside the residence. Tr. 34–35. Floyd advised Mr. Fields that Ms. Tatum had given consent to search the burn pile. Tr. 34. Mr. Fields voiced no objection, but advised Floyd that he intended to observe the search. Tr. 34–35.

Floyd then called in the Evidence Response Team (ERT) to search the burn pile. Tr. 33. Because their internal electrical supply was not functioning, Floyd asked Mr. Fields if they could use electricity from the house to power the search flood lights. Tr. 35. Mr. Fields allowed them to do so. Tr. 35. The search lasted approximately four(4) hours and was limited to the burn pile. Tr. 38.

Ms. Tatum returned to the residence during the course of the search. At no time did she revoke or limit her consent to search. Tr. 38. Mr. Fields did not object to the search and never attempted to revoke or limit Ms. Tatum's consent. Tr. 38.

---

**6.** *This statement conflicts with her statements to the effect that she consented to the search* because she believed that it would exonerate her son.

### b. *Findings*

The government has carried its burden of proving by a preponderance of evidence both that Ms. Tatum's consent was voluntarily given and that her consent was effective with respect to the search of the burn pile located in the back yard of 1907 Grafton.

 Considering all of the relevant factors, the Court finds that the consent to search the burn pile was voluntarily given by Ms. Tatum. First, as Ms. Tatum was not in any type of custodial status when she consented to the search, it cannot be said that her consent was the result of a detention. Second, the procedures employed by Floyd and Block to secure her consent were not coercive.[7] They were dressed in civilian clothes and their weapons were concealed. They were—by Ms. Tatum's own testimony—cordial and non-threatening toward her. Ms. Tatum was cooperative with the agents, further evidencing that her consent was voluntarily given. She was again apprised of her right to refuse to consent to the search, both orally and in writing. As previously considered, Ms. Tatum's intelligence is sufficient to enable her to voluntarily consent to the search. And finally, Ms. Tatum made clear to Floyd and Block that she consented to the search because she believed it would exonerate her son. That she believed no incriminating evidence would be found as a result of their efforts also suggests that her consent was voluntarily given.

 Ms. Tatum's consent to search the burn pile was effective inasmuch as she had common authority over the entire residence generally and the burn pile specifically. As previously considered, Ms. Tatum had at the time she consented to both searches common authority over the entire residence. The Court finds that she likewise had common authority over the burn pile, which was located approximately ten (10) feet from the house in the back yard. The burn pile was used by the residents at 1907 Grafton to burn waste that the collection services would not remove. The Court finds that it is reasonable to recognize that Ms. Tatum had the right to permit the inspection of the burn pile in her own right. It is likewise reasonable to find that the defendant assumed the risk that she might permit the burn pile to be searched.

 The Court finds that the government did not exceed the scope of the consent given by Ms. Tatum. She orally consented to Floyd's request to search the burn pile. The form she executed consented to the search of the area around her residence. The burn pile, located approximately ten (10) feet from the house, is certainly within that description.

It is for these reasons that the Court denied the defendant's motion to suppress the evidence seized in the course of the second search of the defendant's residence.

## B. WARRANTS NOT SUPPORTED BY PROBABLE CAUSE

Defendant contends that the warrants authorizing search warrants for the seizure of his automobile, jail property, hair and blood were not supported by probable cause. *See Def.'s Mot. at II(B)(E).* The defendant specifically complains that the affidavits in support of the warrants are deficient in that they: (1) fail to state the names of the confidential informants (CIs) from whom the affiant received information in support of warrants; (2) fail to state the number of CIs from whom the

---

7. The only evidence of any coercive police procedures was Ms. Tatum's testimony that Floyd told her that he would secure a search warrant for the burn pile if she refused to consent to the search. This statement weighs only slightly in favor of a finding of coercive law enforcement procedures. *See Tompkins,* 130 F.3d at 121–22. However, given that voluntariness is to be determined based upon the totality of the circumstances and in light of the fact that no one factor is dispositive, the Court finds that Ms. Tatum's consent was voluntarily given even in spite of this statement.

affiant received information in support of warrants; (3) fail to state when, where and how the affiant received information from the CIs; and (4) fail to state that the CIs were known to be reliable and credible and that they had previously provided true and correct information. *See Def.'s Mot. at II(B)(E)*.

The government responds that there was a substantial basis for the issuing judge to find that probable cause existed. *See Gov't Resp. at 17*. In the alternative, the government responds that the evidentiary fruits of the search are admissible because the good faith exception to the probable cause requirement applies. *Id.*

### 1. *Legal Background*

■ Consideration of a motion to suppress evidence secured under the authority of a search warrant is a two-step analysis. *See United States v. Cherna*, 184 F.3d 403, 407 (5th Cir.1999). The Court must first determine "whether the good faith exception to the exclusionary rule announced in *United States v. Leon*, 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984), applies." *Id.* If the good faith exception applies, the court need not go any further, and the motion to suppress should be denied. *Id.* If the good faith exception does not apply, the court should then consider whether the issuing judge had a substantial basis for concluding that probable cause existed. *Id.*

The Court's analysis of the good faith exception begins with *Leon*, in which the Supreme Court held admissible evidence seized in reasonable, good-faith reliance on a facially valid search warrant, despite an ultimate finding that the warrant was not supported by probable cause. *See Leon*, 468 U.S. at 922, 104 S.Ct. 3405. In *Leon*, the district court granted the defendant's motion to suppress evidence, finding that the affidavit upon which the warrant issued was insufficient to establish probable cause. *See Leon*, 468 U.S. at 903, 104 S.Ct. 3405. Recognizing the cost of suppressing reliable physical evidence seized by officers reasonably relying upon a warrant issued by a neutral magistrate, the Court concluded that "such evidence should be admissible in the prosecution's case in chief." *Id.* at 913, 104 S.Ct. 3405.

The *Leon* court noted four situations in which the so-called good faith exception did not apply, including the case where law enforcement seizes evidence predicated upon a warrant so lacking in indicia of probable cause as to render belief in its existence entirely unreliable.[8] *Id.* at 914, 104 S.Ct. 3405. The Court observed that the exclusion of the evidence where an officer with objectively good faith executes a warrant issued by a neutral judge did not effect the purpose of the exclusionary rule—deterrence of police misconduct. *Id.* at 921, 104 S.Ct. 3405. This is so because it is the responsibility of the issuing judge to determine whether the affidavit establishes probable cause. *Id.* "[A]n officer cannot be expected to question the magistrate's probable cause determination or his judgment that the form of the warrant is technically sufficient." *Id.* "Penalizing the officer for the magistrate's error, rather than his own, cannot logically contribute to the deterrence of Fourth Amendment violations." *Id.*

■ In evaluating whether law enforcement's reliance upon a search warrant was reasonable, it is well established that " '[a]n officer may rely in good faith on the validity of a warrant so long as the warrant is supported by more than a bare bones affidavit.' " *See United States v. Cherna*, 184 F.3d 403, 409 (5th Cir.1999). "Bare bones affidavits contain wholly conclusory statements, which lack the facts

**8.** The other three situations in which the good faith exception is inapplicable: (1) where the issuing judge was misled by information that the affiant knew was false or would have known was false but for his reckless disregard for the truth; (2) where the issuing judge wholly abandoned his judicial role; and (3) where the warrant is facially defective. *See Leon*, 468 U.S. at 914, 104 S.Ct. 3405.

and circumstances from which a magistrate can independently determine probable cause." *See United States v. Fields*, 72 F.3d 1200, 1214 (5th Cir.1996). However, "[a]n affidavit need not present a watertight criminal case to support good-faith reliance on a warrant." *See Cherna*, 184 F.3d at 410–11.

If the court finds the good faith exception inapplicable, it must then determine whether there was a substantial basis for the probable cause determination by the issuing judge. The court's review of the evidential sufficiency for a warrant follows, as it must, the principles established by the Supreme Court in the seminal case *Illinois v. Gates*, 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983). In *Gates*, the Court held that whether there was is probable cause to support issuance of a warrant is to be judged by the "totality of the circumstances" (as opposed to the previously utilized rigid two-pronged test).[9] *Id.* at 230–38, 103 S.Ct. 2317.

 Probable cause is "a practical, commonsense decision whether, given all the circumstances set forth in the affidavit . . ., there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Id.* at 238, 103 S.Ct. 2317. "[O]nly the probability, and not a *prima facie* showing of criminal activity is the standard of probable cause." *Id.* at 235, 103 S.Ct. 2317. "[P]robable cause is a fluid concept—turning on the assessment of probabilities in particular factual contexts—not readily, or even usefully, reduced to a neat set of legal rules." *Id.* at 232, 103 S.Ct. 2317.

*Gates* also guides this Court's deference to the issuing magistrate's determination of probable cause. "[A]fter-the-fact scrutiny by courts of the sufficiency of an affida-

vit should not take the form of *de novo* review." *Id.* at 236, 103 S.Ct. 2317. "[L]ine-by-line scrutiny" of the underlying affidavit is inappropriate. *Id.* at 246 n. 14, 103 S.Ct. 2317. Rather, reviewing courts are to accord the issuing judge's determination "great deference." *Id.* at 236, 103 S.Ct. 2317. Recognizing that affidavits are typically drafted by nonlawyers in the midst and haste of a criminal investigation, the Court concluded that "[t]echnical requirements of great specificity . . . have no proper place in this area." *Id.* at 235, 103 S.Ct. 2317. The Court observed that hypertechnical critique of warrants would only, in the end, encourage warrantless searches, undermining the very right the Fourth Amendment seeks to protect. *Id.*

 Information supplied by confidential informants can establish probable cause. *Id.* at 232, 103 S.Ct. 2317. " '[I]nformants' tips, like all other clues and evidence coming to a policeman on the scene may vary greatly in their value and reliability.' " *Id.* It is for this reason that "[r]igid legal rules are ill-suited" and " '[o]ne simple rule will not cover every situation' " in which information has been received from an informant. *Id.* While the veracity and basis of the informant's knowledge are both "relevant considerations," . . . "a deficiency in one may be compensated for, in determining the overall reliability of a tip, by a strong showing as to the other, or by some other indicia of reliability." *Id.* at 233, 103 S.Ct. 2317; *see also Cisneros*, 112 F.3d at 1279.

 The credibility of informants can be established by first hand knowledge, the detail of the information given as well as by corroboration. *See Fields*, 72 F.3d at 1214. It is not essential that the affiant aver that the informant was previ-

---

**9.** The Court explained its deviation from the earlier approach in this way:

" '[V]eracity,' 'reliability' and 'basis of knowledge' are all highly relevant in determining the value of [a CI's] report. We do not agree, however, that these elements should be understood as entirely separate and

independent requirements to be rigidly exacted in every case. . . . Rather, . . . they should be understood simply as closely intertwined issues that may usefully illuminate the commonsense, practical question whether there is 'probable cause' to believe that contraband or evidence is located in a particular place."

ously reliable. *See United States v. Harris,* 403 U.S. 573, 581, 91 S.Ct. 2075, 29 L.Ed.2d 723 (1971). Nor is it necessary that the affidavit identify the name of the informant. *Id.* at 584–85, 91 S.Ct. 2075. Likewise, failure to include the way in which the confidential informant obtained the information is not fatal. *See United States v. Laury,* 985 F.2d 1293 (5th Cir. 1993). Finally, "[t]here is no requirement that an affidavit detail the manner in which the affiant gathered the information." *See United States v. Brown,* 941 F.2d 1300, 1304 (5th Cir.1991).

### 2. *1985 Cadillac Fleetwood Brougham*

#### a. *Affidavit*

On January 15, 1999, state district court Judge Robin D. Sage issued a search warrant authorizing the search and seizure of defendant's 1985 Cadillac Fleetwood Brougham. *See Gov't Resp., Ex. C* at Bates Stamp 100. Judge Sage relied upon an eleven (11) page affidavit submitted by F.B.I. Special Agent James N. Mendez. *Id.* at 92–98. Agent Mendez attached to the affidavit copies of the documents supporting the arrests of Charles Stephens and Daymon Smith. *Id.* at 98–99.

The affidavit established that Agent Mendez had in excess of ten (10) years' law enforcement experience with the F.B.I. *Id.* at 92. It further indicated that he was personally involved in the investigation of the Ronnie Ritch, Robert C. Ely and Betty Paddie murders. *Id.* He identified the sources of the information contained in the affidavit. *Id.*

The affidavit provides that Agent Mendez was advised of a conversation defendant had with a CI in which the defendant discussed details of the Ely murder that were unique to the investigation. *Id.* at 94. The defendant told the CI that he observed "Chuck"[10] shoot Mr. Ely in the stomach at the car wash. The defendant

told the CI that he and Stephens stole Mr. Ely's wallet, but that there was no money—only credit cards—found therein. *Id.* The defendant also told the CI that on December 14, 1998 (the day of both the Ely murder and the defendant's arrest on unrelated charges), the defendant told Stephens to go to 1907 Grafton, which law enforcement confirmed was the defendant's residence, and retrieve Mr. Ely's wallet from his dresser drawer. *Id.* Mr. Ely's wallet was in fact found on Stephen's person when he was arrested on January 7, 1999. *Id.* Agent Mendez averred that the CI was "deemed reliable" and that his knowledge was based upon his personal conversations with the defendant. *Id.*

Agent Mendez further stated that the information received from the CI had been corroborated, was consistent with the facts of the case and comported with the statements of other witnesses. *Id.*

The affidavit further provides that Agent Mendez observed the defendant's vehicle in the course of the search of defendant's residence on January 15, 1999. *Id.* at 95. The defendant was arrested on unrelated charges in this vehicle on December 14, 1998—the day of the Ely murder. *Id.* Agent Mendez saw a dark colored ski mask in plain view on the front seat of the vehicle. *Id.*

#### b. *Findings*

■ The Court first finds that the law enforcement officers who conducted the search of defendant's 1985 Cadillac Fleetwood Brougham did so in reasonable, good faith reliance on a facially valid search warrant. The warrant was not so lacking in indicia of probable cause so as to render belief in the existence of probable cause unreliable. The affidavit by Agent Mendez in support of the warrant was not a bare bones affidavit. To the contrary, the affidavit contained sufficient facts from

---

**10.** In the course of the investigation, it was determined that Charles Stephens is known to some as "Chuck." *Id.* at 94.

which the issuing judge could make the probable cause determination.

■ Moreover, the Court finds that, in light of all of the circumstances set forth in the affidavit, there was a substantial basis for Judge Sage to conclude that there was fair probability that contraband or evidence of a crime would be found in the defendant's 1985 Cadillac Fleetwood Brougham. The CI had personal knowledge of the information communicated to Agent Mendez. The information communicated by the CI was very detailed and unique to the facts of the case. Moreover, the information communicated by the CI was corroborated by Agent Mendez, was consistent with the facts of the case and comported with the statements of other witnesses.

Defendant complains that the affidavit was legally insufficient because it was lacking in the following respects: (1) absence of the name of CIs from whom the affiant received information in support of warrants; (2) absence of the number of CIs from whom the affiant received information in support of warrants; (3) failure to set forth the circumstances of when, where and how the affiant received information from the CIs; (4) and failure to establish that the CI was known to be reliable and credible and that he had previously provided true and correct information. *See Def.'s Mot. at II(B)(E)*.

The first and third contentions are without any legal merit. *See Harris*, 403 U.S. at 584–85, 91 S.Ct. 2075 (not necessary that the affiant identify name of informant); *see also Brown*, 941 F.2d at 1304 (no requirement that an affidavit detail the manner in which the affiant gathered the information).

■ Defendant's complaint regarding the number of CIs from whom Agent Mendez received information is not supported by the facts. While the affidavit does refer to cooperating individuals in the plural, the Court is of the opinion that a logical reading of the affidavit supports the interpretation that the affidavit only relies upon information received from one (1) CI, that CI referred to in paragraph 9. *See Affidavit at 94*. Moreover, defendant has failed to bring before the Court any case which stands for the proposition that failure to include the number of CIs from whom information was received is fatal to an affidavit, and the Court concludes that it is not.

With respect to the defendant's fourth argument, the Court finds that the credibility and reliability of the CI was established by his first hand knowledge, the detail of the information given and the subsequent corroboration of his statements. Defendant's contention that the affiant only averred that the CI was "deemed reliable" as opposed to "reliable" is of no significance. The Supreme Court has expressly admonished courts not to review affidavits with such hypertechnical, semantic, line-by-line scrutiny. *See Gates*, 462 U.S. at 235–36, 103 S.Ct. 2317.

It is for these reasons that the Court denied defendant's motion to suppress the evidence seized from his vehicle.

### 3. Blood, Hair and Jail Property

#### a. Affidavit

On February 3, 1999, state court district Judge Alvin G. Khoury issued a search warrant authorizing the seizure of defendant's jail property and sample of his blood and hair. *See Gov't Resp., Ex. D, Bates Stamp 128*. Defendant was at this time in the custody of Smith County Jail in Tyler, Texas on charges unrelated to the murders. The warrant was executed on February 4, 1999.

F.B.I. Special Agent Mendez submitted the affidavit in support of this warrant as well. *Id*. at 125. The affidavit was six (6) pages in length. Attached to the affidavit were copies of the warrants authorizing the arrest of Charles Stephens and Daymon Smith in connection with the murders. *Id*. at 126–27.

The affidavit established that Agent Mendez had in excess of ten (10) years' law enforcement experience with the F.B.I. *Id.* at 120. It further indicated that he was personally involved in the investigation of the Ronnie Ritch, Robert C. Ely and Betty Paddie murders. *Id.* at 120–21. He identified the sources of the information contained in the affidavit. *Id.*

Agent Mendez averred that reliable CIs had linked the defendant to the Ritch and Ely murders. *Id.* at 122. The basis of the CIs' information was their personal conversations with the defendant and/or Charles Stephens. *Id.* Agent Mendez represented that the information provided by the CIs had been corroborated, was consistent with the investigation and comported with the statement given by other witnesses. *Id.*

Agent Mendez averred that trace evidence—hair, body fluids, gun-shot residue and clothing fibers—is often transferred during the course of a crime. *Id.* Blood, hair, and fiber samples were in fact recovered in the course of the investigation and submitted for trace evidence analysis. *Id.* at 122.

Autopsies confirmed that the deaths of both Ronnie Ritch and Robert Ely were the result of gunshot wounds. *Id.* at 121. As such, it was probable that trace gunshot residue was transferred in the course of the crimes. Police officers recovered a .38 caliber weapon near the vehicle driven by Charles Stephens at the time of his arrest. *Id.* at 122. Subsequent testing by the Texas Department of Public Safety confirmed that it was the weapon used in the Ritch and Ely murders. *Id.* at 122.

Personal items were taken from both Ritch and Ely, indicating that contact between the perpetrators and the victims had occurred, further supporting the theory that trace evidence was transferred. *Id.*

Based on the foregoing, Agent Mendez requested authority to seize the clothing worn by the defendant at the time of his arrest. The defendant had been arrested within hours of the Robert Ely murder on charges unrelated to that crime. *Id.* at 124. Based upon his law enforcement training and experience, Agent Mendez stated that if the defendant was involved in Mr. Ely's murder, it is likely that the clothing worn by him at the time of his arrest (which was in jail custody) would contain trace evidence of the Ely murder. *Id.*

Moreover, if he was involved in the murders, it is likely that trace evidence would have been transferred from his person to the crime scenes. *Id.* Agent Mendez therefore requested authority to seize samples of the defendant's hair and blood to compare it to trace evidence found at the crime scenes, on the defendant's clothing and inside the vehicle driven by Stephens at the time of his arrest, immediately following the Betty Paddie murder. *Id.* at 125.

b. *Findings*

The Court first finds that the law enforcement officers who seized the defendant's jail property and samples of his hair and blood did so in reasonable, good faith reliance on a facially valid search warrant. The warrant was not so lacking in indicia of probable cause so as to render belief in the existence of probable cause unreliable. The affidavit by Agent Mendez in support of the warrant was not a bare bones affidavit. To the contrary, the affidavit contained sufficient facts from which the issuing judge could make the probable cause determination.

Moreover, the Court finds that, in light of all of the circumstances set forth in the affidavit, there was a substantial basis for Judge Khoury to conclude that there was fair probability that contraband or evidence of a crime would be found amongst the defendant's jail property and as a result of forensic testing on his blood and hair. The affidavit is supported by first hand information from CIs. Moreover, the information communicated by the CIs was

corroborated by Agent Mendez, was consistent with the facts of the case and comported with the statements of other witnesses.

Defendant incorporates by reference the arguments he made regarding the insufficiency of the affidavits supporting the search of his automobile. With respect to that search, defendant argued that the affidavit was legally insufficient to establish probable cause because it was lacking in the following respects: (1) absence of the name of the CIs from whom the affiant received information in support of warrants; (2) absence of the number of CIs from whom the affiant received information in support of warrants; (3) failure to set forth the circumstances of when, where and how the affiant received information from the CIs; (4) and failure to establish that the CIs were known to be reliable and credible and that they had previously provided true and correct information. *See Def.'s Mot. at II(B)(E)*.

The Court's consideration of the defendant's arguments as applied to the seizure of his jail property and samples of his blood and hair comports with the analysis above.

It is for these reasons that the evidentiary fruits of the search and seizure of defendant's jail property, hair and blood shall be admissible.

### IV. CONCLUSION

In conclusion, the Court finds that the defendant's Fourth Amendment rights were not violated by any of the searches at issue, that the evidentiary fruits of the searches are admissible, and that the *Defendant's Motion for Suppression of Physical Evidence* [Clerk's Docket No. 362] should be in all things denied.